**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2667-23

IN THE MATTER OF THE
LICENSE OF NIKHIL S.
PARIKH, M.D., LICENSE
NO. 25MA41657 TO
PRACTICE MEDICINE AND
SURGERY IN THE STATE OF
NEW JERSEY.

_____

Submitted September 10, 2025 – Decided January 21, 2026

Before Judges Gummer and Vanek.

On appeal from the New Jersey State Board of Medical Examiners, Division of Consumer Affairs, Department of Law and Public Safety.

Zucker Steinberg & Wixted, PA, attorneys for appellant Nikhil S. Parikh, M.D. (David W. Sufrin, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent New Jersey State Board of Medical Examiners (Donna Arons, Assistant Attorney General, of counsel; Daniel Evan Leef Hewitt, Deputy Attorney General, on the brief).

PER CURIAM

Petitioner Nikhil S. Parikh, M.D., appeals from an April 19, 2024 order of the New Jersey State Board of Medical Examiners (Board) compelling, among other things, his compliance with the chaperone requirement of a March 14, 2007 consent order. Because the Board did not act arbitrarily, capriciously, or unreasonably in issuing the order and because its decision was supported by substantial credible evidence in the record, we affirm.

I.

We summarize the key facts and procedural history at issue in this appeal. After a patient alleged petitioner had engaged in inappropriate sexual contact with her in 2002, petitioner was indicted for fourth-degree criminal sexual contact, N.J.S.A. 2C:14-3(b). As set forth in a September 22, 2003 interim consent order issued by the Board, petitioner agreed to use a chaperone when he was treating female patients while the criminal charge was pending against him. He was ultimately acquitted of the charge.

Petitioner testified in 2005 during the criminal proceedings. His testimony was described in the March 14, 2007 consent order as follows:

> The doctor testified on his own behalf . . . and admitted to asking the patient for a hug and hugging her for approximately one to one-and-one-half minutes. He testified that he lost control of himself and hugged her in a sexual manner; that he was excited; and that his pelvic area may have inadvertently come into contact

with the patient's. The doctor testified that when he realized the patient was upset by his actions, he released her.

Petitioner does not dispute that description of his testimony.

Following that testimony, in 2006, the Attorney General filed an administrative complaint against petitioner. The complaint was resolved with the Board's entry of the March 14, 2007 consent order. Petitioner and his attorney signed the consent order. The following language appeared above petitioner's signature: "I have read the above terms of the within [o]rder. I understand the terms of the [o]rder and I agree to be bound by same." Petitioner's attorney represented above his signature that "[c]onsent is hereby given as to the form and entry of this [o]rder."

In the consent order, the Board found, "based on [petitioner's] testimony, that [he had] engaged in sexual contact with a patient and sexual harassment of a patient, in violation of the sexual misconduct regulation, N.J.A.C. 13:35-6.3[,]" and that his "conduct constitute[d] professional misconduct, in violation of N.J.S.A. 45:1-21(e)." In addition to a one-year suspension of his license to practice medicine, under the consent order, petitioner agreed to "retain, at his own expense, a professionally licensed person to function as a chaperone whenever the [petitioner] is treating female patients." He agreed the chaperone

3

had to be "approved by the Board" and would "be in [his] company at all times during the examination and treatment of female patients, in all practice settings." He agreed the chaperone would "immediately notify the Medical Director of the Board and the Attorney General" if the chaperone became "aware of any inappropriate conduct with female patients by [petitioner]," was "aware or reasonably should be aware that [petitioner was] not in full compliance with any portion of this [o]rder," or had "reason to believe that [petitioner's] conduct may pose any threat of harm to others." Petitioner agreed the chaperone would be given a copy of the consent order, had to agree in writing to be bound by its terms, would be "subject to on-going approval by the Board," and would submit to the Board's Medical Director "quarterly reports . . . confirming [petitioner's] cooperation with the chaperone requirements."

The consent order provided petitioner could apply to the Board "for relief from the [chaperone] requirement" after four years, which the Board could "grant or deny . . . at [its] sole discretion." Petitioner agreed "[a]ny deviation from the terms of this [o]rder without prior written consent of the Board shall constitute a violation of the [o]rder."

On November 27, 2023, the Attorney General moved before the Board to enforce the terms of the consent order, asserting petitioner had failed to comply

4

with the chaperone requirement. In support of that motion, the Attorney General relied on February 25, 2022 and June 8, 2023 investigative reports concerning petitioner and a transcript from petitioner's November 2, 2022 appearance before the Board's Preliminary Evaluation Committee (PEC). Petitioner did not include copies of those documents in his appellate appendices.

According to the Board, the February 25, 2022 report concluded petitioner "was not using a Board-approved chaperone, but instead was utilizing his staff members, who are unlicensed individuals and not Board-approved, as his chaperones while treating female patients" and the June 8, 2023 report concluded petitioner continued to be non-compliant with the chaperone requirement of the consent order. The Board stated that during his November 2, 2022 appearance, petitioner had "admitted that he was utilizing his employees as chaperones and that he never received express permission from the Board to deviate from the 2007 [c]onsent [o]rder" and contended his prior attorney had advised him he no longer needed to follow the consent order. Petitioner does not dispute the Board's description of the reports or the statements he made during that appearance.

The Board conducted a public hearing regarding the motion on December 13, 2023. Petitioner appeared at that hearing and was represented by counsel.

One deputy attorney general appeared at the hearing to prosecute the matter; a different deputy attorney general served as an advisor to the Board.

During the hearing, petitioner testified: he had used Board-approved chaperones from 2003 until 2013, when his then-attorney told petitioner he could use office staff and that he would file a motion to relieve petitioner of the conditions of the consent order when petitioner was "ready"; he had not moved to be relieved of those conditions, including the chaperone requirement; and inspectors in the last ten years had known he was using office staff and had told him he was "compliant" and "doing the right things." Petitioner also testified he had submitted members of his office staff to the Board for approval as chaperones and asserted the Board had said, "okay." However, petitioner's counsel conceded the Board had not approved them.

After considering the evidence presented and counsels' arguments, the Board granted the motion in a decision it placed on the record that day. The Board found it "clear that [petitioner] is currently not in compliance with the chaperoning requirements" of the consent order. It ordered petitioner to "come into full compliance with all chaperoning requirements" on or before January 12, 2024. In the interim, the Board permitted petitioner to continue to use office staff as chaperones. The Board ordered that petitioner would be precluded from

6

providing care to female patients if he did not resume using Board-approved, licensed chaperones by the January 12, 2024 deadline. The Board subsequently assessed petitioner $25,140.97 in counsel fees and costs sought by the Attorney General.

The Board memorialized its decision in an April 19, 2024 order. In that order, the Board found:

> It is apparent that [petitioner] is currently not in compliance with the chaperoning requirements of the 2007 [c]onsent [o]rder, that he ceased complying with the [c]onsent [o]rder's requirement in or about 2013, and that his doing so was never formally approved by the Board. Simply put, [petitioner] elected to substitute his judgment for that of the Board, and unilaterally decided to stop complying with the mandatory chaperoning requirements imposed by the Board. . . . The need for chaperoning requirements existed in the first place because [petitioner] engaged in inappropriate conduct with a female patient. In very large measure, the requirements were imposed because of bad judgment and decisions on [petitioner's] part. [Petitioner's] unilateral decision to discontinue complying with the Board's chaperoning requirements, and in particular his decision not to immediately seek to comply after becoming aware of the significant concerns that the Board had based on his November 22, 2022 PEC appearance, reflect similar flawed judgment.

This appeal followed. Petitioner argues the Board had waived the chaperone requirement and that the Board's procedure deprived petitioner of proper notice and the opportunity to be heard before a judicial forum, thereby

7

violating the New Jersey Constitution's separation-of-powers provision, N.J. Const. art. III, ¶ 1. He also contended the Board's decision was unsupported by a clear danger to the public. Unpersuaded by those arguments, we affirm.

II.

Our review of an administrative agency's final decision is limited. Seago v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 257 N.J. 381, 391 (2024). "Courts generally afford substantial deference to the actions of administrative agencies such as the Board . . . because of the 'expertise and superior knowledge' of agencies in their specialized fields . . . and because agencies are executive actors." In re License Issued to Zahl, 186 N.J. 341, 353 (2006) (quoting Greenwood v. State Police Training Ctr., 127 N.J. 500, 513 (1992)). We also "afford[] a strong presumption of reasonableness to an administrative agency's exercise of its statutorily delegated responsibilities." Columbia Fruit Farms, Inc. v. Dep't of Cmty. Affs., 470 N.J. Super. 25, 36 (App. Div. 2021) (alteration in original) (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)) (internal quotation marks omitted).

Thus, we "will not reverse an agency's decision unless: (1) it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the

findings on which it was based were not supported by substantial, credible evidence in the record." Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Env't Prot., 191 N.J. 38, 48 (2007); see also In re Kim, 403 N.J. Super. 378, 388 (App. Div. 2008) (declining "to interfere with the exercise of the Board's broad regulatory authority in the absence of arbitrary, capricious or unreasonable action" (quoting In re Markoff, 299 N.J. Super. 607, 612-13 (App. Div. 1997))). Although we generally "afford substantial deference to an agency's interpretation of a statute that it is charged with enforcing," we are not "bound by the agency's interpretation of a statute or its determination of a strictly legal issue." Univ. Cottage Club, 191 N.J. at 48 (quoting In re Taylor, 158 N.J. 644, 658 (1999)). The party challenging the administrative action bears the burden of proving it was arbitrary and capricious. Lavezzi, 219 N.J. at 171.

The Board is one of several professional licensing boards in this State that is authorized to take disciplinary action against a licensee by the Uniform Enforcement Act (UEA), N.J.S.A. 45:1-14 to -27. See N.J.S.A. 45:1-15; see also Zahl, 186 N.J. at 352-53 (finding the UEA "grants the Board disciplinary powers over medical licensees"). The Legislature vested "the Board with broad authority to regulate the practice of medicine in the State of New Jersey." Zahl, 186 N.J. at 352 (citing the Medical Practices Act, N.J.S.A. 45:9-1 to -27.9).

"The right to practice medicine itself is granted in the interest of the public and is always subject to reasonable regulation in the public interest."  In re Kim, 403 N.J. Super. at 385 (quoting Hirsch v. N.J. Bd. of Med. Exam'rs, 252 N.J. Super. 596, 604 (App. Div. 1991)) (internal quotation marks omitted).

"The Board's supervision of the medical field is critical to the State's fulfillment of its 'paramount obligation to protect the general health of the public.'"  Zahl, 186 N.J. at 352 (quoting In re Polk License Revocation, 90 N.J. 550, 565 (1982)).  The Board is empowered to revoke licenses under certain circumstances but also has discretion to issue disciplinary actions other than revocation, including as ordering professionals "submit to any supervision, monitoring or limitation on practice determined by the [Board] to be necessary." N.J.S.A. 45:1-22(h); see also In re Kim, 403 N.J. Super. at 387 (finding imposition of "a condition to the grant of licensure rather than the more severe denial of licensure" was not "arbitrary, capricious or unreasonable").

Applying these principles, we discern no basis for disturbing the Board's decision to enforce the consent order.  Petitioner does not challenge the Board's authority to impose a chaperone requirement.  He does not dispute agreeing to the imposition of that requirement in the consent order and that he could apply for relief from it after four years.  He concedes he did not apply from relief from

the chaperone requirement and that he stopped complying with it in 2013. Citing the Board's purported "laxity," petitioner argues the Board waived its right to enforce the requirement. We disagree.

"Waiver is the voluntary and intentional relinquishment of a known right." Knorr v. Smeal, 178 N.J. 169, 177 (2003). Although a party may abandon a right "by design or indifference[,] . . . [t]he party waiving a known right must do so clearly, unequivocally, and decisively." Ibid.; see also Cole v. Jersey City Med. Ctr., 215 N.J. 265, 277 (2013) (same). "[W]aiver 'presupposes . . . intentional surrender; waiver cannot be predicated on consent given under a mistake of fact.'" Cnty. of Morris v. Fauver, 153 N.J. 80, 104-05 (1998) (quoting W. Jersey Title & Guar. Co. v. Indus. Trust Co., 27 N.J. 144, 153 (1958)).

Having had the opportunity to observe petitioner's testimony and assess his credibility, the Board was free to reject petitioner's testimony about unnamed inspectors who had told him he was "compliant" and "doing the right things." See In re Snellbaker, 414 N.J. Super. 26, 36 (App. Div. 2010) (finding our deference to a "'credibility determination, made after due consideration of the witnesses' testimony and demeanor during the hearing[,]' . . . extends to credibility determinations that are not explicitly enunciated if the record as a whole makes these findings clear" (quoting H.K. v. State of N.J. Dep't of Hum.

11

Servs., Div. of Med. Assistance & Health Servs., 184 N.J. 367, 384 (2005))). And, with nothing more, petitioner's conclusory assertion about the Board's "laxity" does not establish an "intentional relinquishment of a known right." Knorr, 178 N.J. at 177. Moreover, as the Board found, even after petitioner had become "aware of the significant concerns that the Board had" at the 2022 PEC appearance, he continued to disregard the chaperone requirement he had accepted in the consent order.

Petitioner also faults the process used for the enforcement of the consent order. He claims he had a "limited opportunity to testify," but the record belies that assertion. He complains the 2023 "hearing was facilitated on video '[Z]oom' platform" but offers no explanation as to how the use of that platform prejudiced him. See State v. Vega-Larregui, 246 N.J. 94, 103 (2021) (considering grand-jury proceedings conducted virtually by Zoom, Court held "[b]ecause the virtual process may not be perfect does not mean that it is not mostly effective or unconstitutional"). Petitioner also argues the enforcement of the consent order "should have been addressed in a judicial forum" and that the procedure followed here somehow violated the separation-of-powers doctrine. However, our Supreme Court long ago recognized the ability of an administrative agency to "serve in both prosecutorial and adjudicatory capacities," In re Opinion No.

583, 107 N.J. 230, 236 (1987), and that one deputy attorney general may prosecute a matter before an agency while a different deputy attorney general may be designated to advise the agency, id. at 239-40. That procedure was followed in this case. Cf. Polk, 90 N.J. at 576-77 (in case involving revocation of a medical doctor's license, Court found no error in assignment of a deputy attorney general to prosecute the case who also functioned as a legal advisor to the Board on unrelated matters).

Finally, petitioner contends there was "no showing of any danger to the public." However, "the Legislature did not require a finding of patient harm before authorizing license revocation." Zahl, 186 N.J. at 355 (citing N.J.S.A. 45:1-21). And as the Board found, petitioner's unilateral decision to treat female patients without a professionally licensed Board-approved chaperone in violation of the consent order "manifest[ed] a complete disregard for the authority of [the] Board and an inherent lack of understanding of why a chaperoning requirement[] was imposed in the first instance to protect vulnerable patients."

In sum, because petitioner has not established any arbitrary, capricious, or unreasonable action by the Board or that the Board's decision lacked support by

substantial credible evidence, we affirm the April 19, 2024 order enforcing the

chaperone requirement of the consent order.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division