**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0168-24

IN THE MATTER OF THE
SUSPENSION OR REVOCATION
OF THE LICENSE OF

KIERAN SLEVIN, M.D.
LICENSE NO. 25MA8620600

TO PRACTICE MEDICINE
AND SURGERY IN THE STATE
OF NEW JERSEY.

_____

Argued March 3, 2026 – Decided April 2, 2026

Before Judges Gilson, Perez Friscia, and Vinci.

On appeal from the New Jersey State Board of Medical Examiners, Division of Consumer Affairs, Department of Law and Public Safety.

Andrew Gimigliano argued the cause for appellant Kieran Slevin, M.D. (Mandelbaum Barrett PC, attorneys; Andrew Gimigliano, Mohamed H. Nabulsi, Michael S. Kivowitz and Marlene M. Arabia, on the briefs).

David M. Puteska, Deputy Attorney General, argued the cause for respondent New Jersey State Board of Medical Examiners (Jennifer Davenport, Attorney

General, attorney; Donna Arons, Assistant Attorney General, of counsel; David M. Puteska, on the brief).

PER CURIAM

Kieran Slevin, a medical doctor, appeals from a final administrative decision and order of the State Board of Medical Examiners (the Board). In its decision, the Board found that Slevin had failed to comply with medical recordkeeping obligations and had intentionally and materially altered medical records in violation of N.J.S.A. 45:1-21(e) and (h). As penalties, the Board suspended Slevin's license to practice medicine for six months, imposed a $150,000 fine, and directed Slevin to pay $98,835 in fees and costs.

Slevin contends the Board's findings are not supported by substantial credible evidence and are arbitrary, capricious, and unreasonable. He also asserts that the penalties imposed were disproportionate to the violations found. Having reviewed the record and law, including the evidence developed at a hearing before an administrative law judge (ALJ), we affirm the Board's decisions and the penalties imposed because they are supported by substantial credible evidence, are consistent with the law, and are not arbitrary, capricious, or unreasonable.

I.

Slevin is licensed to practice medicine in New Jersey, New York, Pennsylvania, and Delaware. His medical specialties are anesthesiology and interventional pain management. As part of his experience, Slevin worked at the University of Pennsylvania as an assistant professor and conducted research on the safety and efficacy of fentanyl products.

In 2011, Slevin began working for the Virtua Health System (Virtua), as chief of pain medicine for Virtua's southern New Jersey campuses. Thereafter, Slevin left Virtua and opened his own practice under the name North American Spine & Pain Consultants (NA Pain Consultants).

Beginning at Virtua and continuing at NA Pain Consultants, Slevin treated several patients with Subsys, which is a Transmucosal Immediate Release Fentanyl (TIRF) medication. In 2012, Subsys was approved by the federal Food and Drug Administration (FDA) as a treatment for pain in adult cancer patients. Subsys is a potent pain medication, which has possible side effects, including overdose and death.

Outpatient prescription of Subsys was limited to patients enrolled in the TIRF Risk Evaluation and Mitigation Strategy (REMS) access program administered by the FDA. The TIRF REMS program required physicians

A-0168-24

prescribing Subsys on an outpatient basis to execute TIRF REMS agreements and keep detailed records of prescription information.

In 2016, the New Jersey Attorney General (AG) investigated Slevin concerning his prescriptions of Subsys. In October 2016, the AG issued a document subpoena for Slevin's medical records related to his treatment of five patients. Slevin responded to the subpoena by producing records and certifying that the records were accurate and complete (the First Set of records).

Following a subsequent request for records in 2018, Slevin produced a Second Set of records (the Second Set of records). Slevin certified the Second Set of records were accurate and complete.

In November 2020, the AG filed a five-count administrative complaint against Slevin with the Board. In the first four counts, the AG alleged that Slevin's practice of medicine violated the standard of care because he had recklessly prescribed Subsys to four patients.

The AG also alleged Slevin engaged in professional misconduct in his recordkeeping, and he failed to comply with the Board's administrative regulations concerning recordkeeping. In that regard, the AG alleged that Slevin had violated N.J.S.A. 45:1-21(e) and (h). Concerning the violation of N.J.S.A. 45:1-21(h), the AG asserted that the two sets of medical records Slevin produced

4

for four patients "differ[ed] in their completeness and in internal editing," and did "not meet the 'contemporaneous permanent professional treatment records' standards set forth in the Board['s] regulation[,] N.J.A.C. 13:35-6.5."

Slevin filed an answer, denying the allegations. The parties then engaged in discovery and the matter proceeded to a contested hearing before an ALJ in the Office of Administrative Law. The hearing was conducted over seven days between May and August 2023. At the hearing, the AG submitted numerous documents into evidence, including the First and Second Sets of records. The AG also called a medical expert, Christopher Gharibo, M.D. Slevin testified and called a medical expert, Jeffrey Gudin, M.D. Three of Slevin's patients also testified on his behalf.

In his testimony, Slevin explained his treatment and prescription of Subsys to the four patients. He also described his medical recordkeeping related to those four patients. Slevin acknowledged that there were differences between the First Set of records and the Second Set of records. He also admitted that he had edited the medical records before producing the Second Set of records.

The two medical experts, both of whom were experts in pain management, offered differing opinions concerning whether Slevin's treatment of the four patients was within the standard of care, including the prescription of Subsys.

In terms of the medical records, Dr. Gharibo opined that Slevin's recordkeeping was inadequate. He testified that Slevin's documentation was not specific and largely consisted of copying and pasting information from prior examinations. He also opined that the records did "not account for the extent and complexity of the controlled substance dosing" and did "not justify the opioid-heavy plan of care." Slevin's expert, Dr. Gudin, acknowledged some deficiencies in Slevin's recordkeeping and that Slevin had undated edits to the records, which did not comply with regulations on medical recordkeeping.

On March 5, 2024, the ALJ issued his initial decision, finding that Slevin had met the standard of care when treating the four patients and that he had not exhibited gross negligence when prescribing Subsys. So, the ALJ found the AG failed to prove that Slevin had violated professional medical standards in prescribing Subsys.

The ALJ did find that Slevin had failed to properly prepare his medical records and concluded that the AG had established recordkeeping violations. In making those conclusions, the ALJ determined that Slevin had "failed to document relevant negative findings appropriately, failed to document his rationale for the treatment he ordered, had inconsistencies in his notes, and included what appears to be cut-and-pasted text from month to month without

reflecting changes in dosages." Thus, the ALJ found that Slevin had violated N.J.S.A. 45:1-21(h) "because he failed to comply with the record-keeping obligations imposed by N.J.A.C. 13:35-6.5." The ALJ also concluded "the charges proven regarding [Slevin's] preparation of treatment records and lack thereof constitute negligence but not of a gross nature."

As a penalty, the ALJ suspended Slevin's license to practice medicine in New Jersey for six months. The ALJ also awarded the AG twenty percent of its investigatory costs, expert fees, and attorneys' fees.

Slevin and the AG both filed exceptions to the ALJ's initial decision with the Board. On July 10, 2024, the Board heard oral argument on those exceptions and issued an oral decision on the record. The Board also heard supplemental arguments concerning the penalties to be imposed. Thereafter, on August 13, 2024, the Board issued a thirty-page written decision and order detailing its findings of facts and conclusions of law.

In its decision, the Board rejected the AG's challenge to the ALJ's conclusions that Slevin had not engaged in fraud or professional misconduct with respect to Slevin's care of the patients. The Board also adopted the ALJ's findings of facts regarding Slevin's recordkeeping violations. In adopting the ALJ's findings that Slevin's recordkeeping was inadequate, the Board concluded

7

his "records failed to come anywhere close to minimal acceptable standards, and fell so far short of normative expectations that it was reasonable for [the] ALJ [] to conclude that those violations rose to a level that supported findings of repeated acts of negligence."

The Board also reviewed the evidence and found that Slevin had altered the patient records provided to the AG in discovery. In that regard, the Board found "there is no question that [Slevin] in fact altered records, as the two sets of records that were produced differ in significant and material respects from each other." The Board also noted that "[n]one of the changes made by Dr. Slevin were identified, dated and initialed, which [the Board found were] clear manifestation[s] of an intent to alter the records without making the alteration visible to anyone reading the records." The Board therefore concluded that Slevin had violated both N.J.S.A. 45:1-21(e) and (h) because he had altered four patient records and those actions constituted professional misconduct.

Addressing the appropriate penalties, the Board adopted the ALJ's recommendation to suspend Slevin's license to practice medicine in New Jersey for six months. The Board also directed that when Slevin returned to practice, he was to be independently monitored for one year. Additionally, the Board imposed a civil penalty of $150,000 in accordance with N.J.S.A. 45:1-25.

A-0168-24

Finally, the Board increased the ALJ's imposition of costs from twenty percent to fifty percent and, therefore, directed Slevin to pay $96,835 in fees and costs.

Slevin moved for reconsideration and a stay. The Board rejected both those motions in a written order issued on August 23, 2024. Slevin thereafter sought a stay from us, but we denied that request. Slevin now appeals from the Board's August 13, 2024 final decision and order.

## II.

In his appeal to us, Slevin makes two main arguments. First, he contends that the Board's decisions were arbitrary, capricious, and unreasonable and not supported by the record. As part of that argument, Slevin challenges both the Board's adoption of the ALJ's findings concerning Slevin's negligent recordkeeping and the Board's additional findings that Slevin had intentionally and materially altered patient records. Second, Slevin asserts that his punishment was disproportionate to the offenses the Board found.

The Board has broad authority to regulate the practice of medicine and supervise and discipline licensees. In re License Issued to Zahl, 186 N.J. 341, 352-53 (2006); In re Polk, 90 N.J. 550, 566 (1982). The Supreme Court has explained:

> In this capacity, the State acts as the guardian of the health and well-being of its citizens. It must be vigilant

and competent to protect these interests fully. Its own obligations in this respect are paramount to the rights of the individual practitioner claiming the privilege to pursue his or her medical profession.

> [Polk, 90 N.J. at 566. Accord In re Kim, 403 N.J. Super. 378, 385-87 (App. Div. 2008) (addressing the Board's powers in service of protecting the public).]

A.    Our Standard of Review.

An appellate court's review of an administrative agency's final decision is limited. Seago v. Bd. of Trs., Tchrs.' Pension & Annuity Fund, 257 N.J. 381, 391 (2024); Zahl, 186 N.J. at 353. Appellate courts will not reverse an agency decision unless: (1) "it was arbitrary, capricious, or unreasonable; (2) it violated express or implied legislative policies; (3) it offended the State or Federal Constitution; or (4) the findings on which it was based were not supported by substantial, credible evidence in the record." In re Nicosia, 479 N.J. Super. 360, 371 (App. Div. 2024) (quoting Univ. Cottage Club of Princeton N.J. Corp. v. N.J. Dep't of Env't Prot., 191 N.J. 38, 48 (2007)).

While an appellate court is not "bound by the agency's interpretation of a statute or its determination of a strictly legal issue," ibid. (quoting In re Taylor, 158 N.J. 644, 658 (1999)), a court will generally "afford substantial deference to the actions of administrative agencies such as the Board." Zahl, 186 N.J. at 341. Although the scope of a court's review of an agency's interpretation of a

10

statute can be debated, see In re P.T. Jibsail Fam. Ltd. P'ship Tidelands License No. 1515-06-0012.1 TDI 190001, ___ N.J. ___, ___ (2026) (slip op. at 11, n. 2), in this matter our decision would be the same if we used a de novo standard or a deferential standard concerning the Board's statutory interpretations.

B.   Slevin's Medical Recordkeeping.

As part of their professional responsibilities, physicians must prepare "contemporaneous, permanent [] treatment records."  N.J.A.C. 13:35-6.5(b). Those records must "accurately reflect the treatment or services rendered." Ibid.; see also Newmark-Shortino v. Buna, 427 N.J. Super. 285, 311 (App. Div. 2012).

The standard for medical recordkeeping is set forth in the Board's regulations.  See N.J.A.C. 13:53-6.5.  Physicians are required to keep detailed records of patients' medical history, diagnoses, and treatment, including prescribed medications.  See N.J.A.C. 13:35-6.5(b)(1).  Specifically, these records should include:

(i) The dates of all treatments;

(ii) The patient complaint;

(iii) The history;

(iv) Findings on appropriate examination;

11

(v) Progress notes;

(vi) Any orders for tests or consultations and the results thereof;

(vii) Diagnosis or medical impression; [and]

(viii) Treatment ordered, including specific dosages, quantities and strengths of medications including refills if prescribed, administered or dispensed, and recommended follow-up.

[N.J.A.C. 13:35-6.5(b)(1)(i)-(viii).]

N.J.A.C. 13:35-6.5 also provides explicit instructions on how medical records should be maintained and corrected. N.J.A.C. 13:35-6.5(b)(2) states: "Corrections/additions to an existing record can be made, provided that each change is clearly identified as such, dated and initialed by the licensee." See also Rosenblit v. Zimmerman, 166 N.J. 391, 399 n.1 (App. Div. 2001) (explaining "corrections or changes to [medical records] may be made only where the change is clearly identified"). Electronic records are subject to additional requirements. See N.J.A.C. 13:35-6.5(b)(3). A physician can modify or change a prior electronic entry, but the change must identify the date and time when the new entry was made. N.J.A.C. 13:35-6.5(b)(3)(iii)-(v).

A-0168-24

1. Slevin's Negligent Recordkeeping.

The Board adopted the ALJ's findings that Slevin's patient recordkeeping was negligent. Specifically, the ALJ and Board found that Slevin failed to adequately detail why he chose to prescribe Subsys to each of the four patients and failed to document how each patient reacted after they took Subsys. In making his findings concerning Slevin's inadequate recordkeeping, the ALJ relied on both testifying experts. The ALJ noted "Dr. Gharibo criticized the nature of [Slevin's] records at times, portraying them as at times cryptic, lacking in description, and inadequate to understand what had occurred in reaction to the drugs prescribed." The ALJ also noted that Slevin's own expert had found that Slevin's records were inadequate. In that regard, the ALJ found "Dr. Gudin also commented on the lack of information at times. [Slevin] did not provide adequate representation as to why he chose to prescribe this particular medication to patients."

All those findings are supported by substantial credible evidence, including the evidence presented at the hearing before the ALJ. In that regard, we note that the Board appropriately relied on the ALJ's credibility findings. Moreover, none of the findings are arbitrary, capricious, or unreasonable.

13

We reject Slevin's argument that the Board needed an expert to testify concerning the standard of care for recordkeeping. The Board is made up of medical health professionals, including licensed physicians. See N.J.S.A. 45:9-1. Accordingly, the Board has the capability to determine whether Slevin violated the Board's regulations on recordkeeping. See In re Kerlin, 151 N.J. Super. 179, 185 (App. Div. 1997) (explaining there was no "requirement for [] expert testimony" to establish common treatment practices in a disciplinary action to the veterinarian board); see also Polk, 90 N.J. at 567 (reasoning that statutory standards of medical professional conduct are "capable of objective measurement and application").

Moreover, the Board's factual findings amply support its legal conclusion that Slevin violated N.J.S.A. 45:1-21(h). That statutory provision authorizes the Board to suspend the license of a physician who has "violated or failed to comply with the provisions of any act or regulation administered by the [B]oard."

2.      Slevin's Intentional and Material Alteration of Patient Records.

After independently reviewing the record, the Board also determined that Slevin intentionally and materially altered patient records. In making that finding, the Board compared the First Set of records to the Second Set of records.

That comparison demonstrated that Slevin had made numerous material changes to the patient records.

The Board considered but rejected Slevin's argument that his "alterations to the records should be discounted because they did not result in any patient harm, as well as claims that [his] legal counsel and staff, or the [AG], bear responsibility for the discrepancies." On this issue, the Board stated: "Dr. Slevin alone bore responsibility for ensuring the integrity of the patient records which he maintained, and his submission of two differing sets of records in response to the [AG's] subpoena was necessarily the result of decisions he made and deliberative actions he took to change the records."

Slevin argues that he believed the AG and Board would be able to see those changes, but he acknowledged that he did not identify the dates and times when he made the changes. So, the Board was well within its authority to conclude that Slevin's failure to expressly identify the changes was an attempt to conceal that changes had been made. We have recognized that where a physician has altered medical records, the alterations can be considered evidence that the physician "believed that the original record would have been unfavorable." Newmark-Shortino, 427 N.J. Super. at 311-12 (quoting Model Jury Charge (Civil), 5.50H, "Alteration of Medical Records" (2009)).

A-0168-24

Like the findings concerning negligence, the Board's findings concerning the intentional and material alterations of records are amply supported by substantial credible evidence. In that regard, we note, the agency is "the primary factfinder" and has "ultimate authority upon review of the record submitted by the ALJ to adopt, reject[,] or modify the [ALJ's] decision." N.J. Dep't of Pub. Advoc. v. N.J. Bd. of Pub. Utils., 189 N.J. Super. 491, 507 (App. Div. 1983). We also discern nothing arbitrary, capricious, or unreasonable regarding those findings.

The facts found, moreover, support the Board's legal conclusion that Slevin violated N.J.S.A. 45:1-21(e), which authorizes the Board to penalize a physician who has "engaged in professional or occupational misconduct that may be determined by the [B]oard." See Zimmerman v. Diviney, 477 N.J. Super. 1, 21 (App. Div. 2023) (explaining that an agency's decision will be upheld provided it is supported by substantial, credible evidence and is consistent with the law).

3.    The Penalties Imposed.

The Legislature has authorized the Board to suspend a physician's license when the physician has engaged in professional misconduct or failed to comply with the Board's regulations. N.J.S.A. 45:1-21(e) and (h). Moreover, the Board

16

can assess monetary civil penalties. N.J.S.A. 45:1-25. Additionally, the Board may order the payment of costs "including, but not limited to, costs of investigation, expert witness fees and costs, attorney fees and costs, and transcript costs." N.J.S.A. 45:1-25(d).

In reviewing sanctions imposed by an agency, a court should uphold the penalties unless the punishment "is so disproportionate to the offense, in light of all the circumstances, as to be shocking to one's sense of fairness." Zahl, 186 N.J. at 554; In re Herrmann, 192 N.J. 19, 29 (2007). Accordingly, a court will set aside an administrative sanction only when it is "satisfied that the agency has mistakenly exercised its discretion or misperceived its own statutory authority." Polk, 90 N.J. at 578.

In this matter, the Board determined that Slevin's recordkeeping deviated from the standard of care and its regulations. After reviewing all the evidence, the Board concluded Slevin's recordkeeping violations included intentional and material alterations that were "substantial and pervasive." The Board then agreed with the ALJ's recommendation to suspend Slevin's license to practice medicine in New Jersey for six months.

The Board also imposed a civil penalty. That monetary penalty was authorized under N.J.S.A. 45:1-25, which allows the Board to impose a $10,000

penalty for the first violation and $20,000 for each subsequent violation. The Board determined that Slevin had violated both N.J.S.A. 45:1-21(e) and (h) for each of the four patients. Therefore, the total penalty imposed was within the Board's statutory authority.

Finally, we discern nothing arbitrary, capricious, or unreasonable in the Board's assessment of costs. The Board has the authority to assess full costs. N.J.S.A. 45:1-25(d). In this matter, the Board used its discretion to impose costs consisting of fifty percent.

### III.

In summary, having conducted a thorough review of the record and having analyzed Slevin's contentions in light of the law, we discern nothing arbitrary, capricious, or unreasonable in the Board's findings and legal conclusions. Therefore, we reject each of Slevin's arguments and affirm the Board's decision and order.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-0168-24